### GEISINGER HEALTH PLAN, Petitioner

v.

### UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, Respondent.

Commonwealth Court of Pennsylvania.

Argued Dec. 10, 2008.

Decided Feb. 5, 2009.

Patrick T. O'Connell, Bloomsburg, for petitioner.

Judith M. Gilroy, Asst. Counsel, Harrisburg, for respondent.

BEFORE: LEADBETTER, President Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge,[1] COHN JUBELIRER, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge COHN JUBELIRER.

Geisinger Health Plan (Employer) petitions for review of an order of the Unemployment Compensation Board of Review (Board), which affirmed the Unemployment Compensation Referee's (Referee) decision granting John D. Buckeye (Claimant) benefits pursuant to Section 402(e) of the Unemployment Compensation Law (Law).[2] On appeal, Employer argues that the Board erred in determining that Employer disparately applied its work rule against sending pornographic e-mails and that Claimant was, therefore, eligible for benefits despite engaging in willful misconduct by violating that rule.

Claimant applied for unemployment compensation benefits after Employer discharged him from his employment. The Unemployment Compensation Service Center (Service Center) found Claimant ineligible for benefits because his discharge was a result of willful misconduct. Claimant then filed an appeal. An evidentiary hearing was subsequently held before a Referee on May 16, 2007.

At the hearing, Employer presented the testimony of its HR manager, Erin Winn (Winn). Winn testified that Claimant began working for Employer in October 2005 and that Employer discharged Claimant on February 20, 2007, for violating Em-

---

1. The decision in this case was reached before January 1, 2009, when Judge Friedman assumed the status of senior judge.

2. Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(e).

ployer's electronic communication policy. More specifically, Winn testified that Employer's internal audits department had uncovered as many as twenty-five e-mails that Employer considered to be in violation of its electronic communication policy. Winn stated that she discussed six of these e-mails with Claimant at the time Employer discharged him. Employer introduced these six e-mails into evidence at the hearing.[3] Winn also testified regarding Employer's electronic communication policy, which states:

> Any access to pornography is strictly prohibited on Geisinger time or using Geisinger resources and is grounds for termination.
>
> For the benefit of all of our employees, Geisinger's policy prohibiting harassment applies in its entirety to the use of the electronic communication system including downloading, possession or transmission of materials. No one may use the electronic communications in a manner that may be construed by others as harassment or as offensive on the basis of sex, race, color, religion, national origin, ancestry, age, physical handicap, disability, marital status, veteran's status or any other non-job-related factor.

(Employer's Electronic Communication Policy, Service Center Ex. Nos. 10–11.) On cross-examination by Claimant, Winn stated that some of the twenty-five e-mails uncovered by Employer's internal audit department had been sent to Claimant by other employees. When questioned by Claimant and the Referee as to whether Employer's electronic communication policy was evenly applied, Winn responded that, while other individuals who sent e-mails to Claimant had not been terminated, Employer was continuing to investigate the matter, taking into account the "severity and the inappropriateness of the e-mails." (Referee Hr'g Tr. at 12.) Of the six e-mails that formed the basis for Claimant's termination, E-mail 3, entitled "Happy Halloween," and E-mail 6, the joke about Tarzan, were sent to Claimant by Employer's employees. On redirect, Winn explained that Claimant was terminated in lieu of some lesser discipline "because of the high frequency of the e-mails that were sent during work time to other Geisinger employees and also because of the severity which was [sic] the pornographic images that were forwarded on." (Referee Hr'g Tr. at 14.) Winn also stated that Employer considered pornographic images to be more severe than sexually explicit jokes. (Referee Hr'g Tr. at 14–15.)

When Claimant's turn to testify came, Claimant initially stated that he did not think Employer consistently applied its electronic communication policy. The Referee pointed out that this was an argument, not testimony. Other than stating that he believed he was denied a peer

---

**3.** E-mail 1 contained a picture depicting a topless woman stretching on a bed. (Referee Hr'g Ex. No. E–1.) E-mail 2, entitled "13 REASONS NOT TO DRINK ... EVEN WITH FRIENDS," contained a number of pictures, including one of a partially nude woman, apparently unconscious, lying facedown on a picnic table surrounded by empty bottles. (Referee Hr'g Ex. No. E–2.) E-mail 3, entitled "Happy Halloween," contained a picture of a nude individual whose buttocks were painted to resemble a jack-o-lantern. (Referee Hr'g Ex. No. E–3.) E-mail 4, entitled "Resimay," consisted of a joke about a woman with poor spelling skills being hired as a secretary due to her physical appearance, with an attached picture of a woman with large breasts wearing a bikini top. (Referee Hr'g Ex. No. E–4.) E-mail 5, entitled "HOW TO BE BANNED FROM DISNEYLAND," contained a picture of two women with their breasts decorated to resemble Mickey Mouse. (Referee Hr'g Ex. No. E–5.) E-mail 6 consisted of a sexual joke about Tarzan. (Referee Hr'g Ex. No. E–6.)

review, Claimant did not offer any testimony or documentary evidence.

The Referee reversed the Service Center's determination and granted Claimant benefits. Employer appealed to the Board, which affirmed the Referee's decision. In doing so, the Board made the following findings of fact:

1. The claimant was employed by Geisinger Health Plan as a medicare sales representative having begun his employment in October 2005 on a full-time basis with a final rate of pay of $20.50 per hour.

2. The claimant's last day of work was February 20, 2007.

3. The employer has an electronic communications policy that provides that access to pornography is prohibited and is grounds for termination.

4. The claimant knew and/or should have known the policy.

5. The employer learned through an internal audit that the claimant had been forwarding pornographic e-mails through its computer system to other employees.

6. Some of the e-mails had been sent to the claimant from other employees.

7. The employees who sent the e-mails to the claimant were not disciplined.

8. The claimant was discharged for violating the employer [sic] electronic communication policies.

(Board Decision, Findings of Fact (FOF) ¶¶ 1–8.) Based on these findings of fact, the Board concluded that Claimant was eligible for benefits under Section 402(e) of the Law because Employer did not uniformly enforce its policy. The Board concluded that Claimant had been "disciplined in a disparate manner from other similarly-situated employees." (Board Decision at 2.) The Board noted that it had considered the volume and content of the e-mails sent by Claimant, but characterizing Employer's policy as "zero-tolerance," found that it made no allowance for violation. Claimant was the only employee who had been discharged at the time of the Referee's hearing. In addition to finding that Claimant had been treated differently from other similarly-situated employees, the Board also determined that Employer failed to explain why Claimant had been fired while the two employees who had each sent Claimant one objectionable e-mail were only being investigated. Since Employer offered no explanation as to why other employees were still only being investigated, the Board concluded that Claimant had shown that Employer had disparately enforced its electronic communication policy. Employer now petitions for review of the Board's order.[4]

Employer argues that the Board erred when it determined that Employer disparately applied its electronic communication policy. We agree.

■ An employee is not eligible to receive unemployment compensation "for any week . . . [i]n which his unemployment is due to his discharge or temporary suspension from work for willful misconduct connected with his work." 43 P.S. § 802(e). This Court has defined the term "willful misconduct" to mean:

(1) the wanton and wilful disregard of the employer's interest, (2) the deliberate violation of rules, (3) the disregard of standards of behavior which an employ-

---

4. "The Court's review is limited to determining whether constitutional rights were violated, whether an error of law was committed, whether a practice or procedure of the Board was not followed or whether the findings of fact are supported by substantial evidence in the record." *Western & Southern Life Ins. Co. v. Unemployment Compensation Board of Review*, 913 A.2d 331, 334 n. 2 (Pa.Cmwlth. 2006).

er can rightfully expect from his employee, or (4) negligence which manifests culpability, wrongful intent, evil design, or intentional and substantial disregard for the employer's interests or the employee's duties and obligations. *Kentucky Fried Chicken of Altoona, Inc. v. Unemployment Compensation Board of Review,* 10 Pa.Cmwlth. 90, 309 A.2d 165, 168–69 (1973). "The burden of proving willful misconduct rests with the employer." *Walsh v. Unemployment Compensation Board of Review,* 943 A.2d 363, 368 (Pa.Cmwlth.2008). If the employer seeks to satisfy its burden of proof by showing that a claimant violated the employer's work rule, the employer must also show that the rule existed and that the claimant violated that rule. *Id.* at 369.

Disparate treatment is an affirmative defense by which a claimant who has engaged in willful misconduct may still receive benefits if he can make an initial showing that: (1) the employer discharged claimant, but did not discharge other employees who engaged in similar conduct; (2) the claimant was similarly situated to the other employees who were not discharged; and (3) the employer discharged the claimant based upon an improper criterion. *See Department of Transportation v. Unemployment Compensation Board of Review,* 755 A.2d 744, 748 (Pa.Cmwlth.2000) ("[T]he essence of disparate treatment is not only whether unlawful discrimination has occurred but also whether similarly situated people are treated differently, based upon improper criteria."). Once the claimant has made this showing, the burden then shifts to the employer to show that it had a proper purpose for discharging the claimant.[5] There are opinions of this Court that have been less than clear in applying the burden of proving disparate treatment. For example, in *Remcon Plastics, Inc. v. Unemployment Compensation Board of Review,* 651 A.2d 671 (Pa.Cmwlth.1994), this Court appeared to put the burden on the employer to show that it had a proper purpose for firing the claimant, but not another employee engaged in identical misconduct. *Id.* at 673 ("Employer offered no evidence of proper criteria such as business necessity to justify the disparate treatment of Claimant.").[6] However,

---

**5.** Requiring a claimant to make an initial showing of different treatment from similarly situated individuals due to improper criteria before shifting the burden to employer to justify the discharge is similar to the shifting burden articulated by the United States Supreme Court in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) for establishing employment discrimination. Under the *McDonnell Douglas* standard, a complainant alleging employment discrimination must make a prima facie case by showing that: 1) he "is a member of a protected class; 2) he was the object of adverse employment action; 3) he was qualified for the position in question; and 4) he was replaced by someone" who is not a member of the protected class referenced in (1). *Associated Rubber, Inc. v. Pennsylvania Human Relations Commission,* 915 A.2d 689, 695 n. 13 (Pa.Cmwlth.2007) (citing *McDonnell Douglas* ). It is only after the complainant makes this prima facie showing, that the burden "shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions," after which the complainant bears the burden of showing that the employer's proffered reason is pretextual. *Id.* at 696.

**6.** We note, however, that the facts in *Remcon* are consistent with a disparate treatment defense. In our recitation of the facts in *Remcon,* this Court noted that "Claimant indicated he was informed that he was discharged for 'fighting' but that he did not agree with this because, 'I was defending myself and the other guy was not fired. *Also, I was on light-duty and they don't like people being on light-duty.'* " *Remcon,* 651 A.2d at 673 (internal citation omitted) (emphasis added). This Court also noted an age difference between the claimant in *Remcon,* who was fifty-two, and the co-worker who was not fired, who was twenty-three. *Id.* at 672.

in other cases, this Court has considered whether the claimant initially met the burden of showing the elements of disparate treatment. *See, e.g., Walsh,* 943 A.2d at 370 ("Claimant *was required to establish* that Employer treated similarly situated employees differently based upon improper criteria." (emphasis added)); *Workinger v. Unemployment Compensation Board of Review,* 667 A.2d 436, 438 (Pa.Cmwlth. 1995) (holding that the claimant had failed to rebut the employer's showing of willful misconduct with evidence that other employees were not disciplined for similar misconduct); *Palmer v. Unemployment Compensation Board of Review,* 50 Pa. Cmwlth. 300, 412 A.2d 917, 918 (1980) (stating that the claimant's disparate treatment argument "would have merit if claimant had alleged that enforcement of the company rules had been based on improper discrimination such as racial bias"). Moreover, it is important to remember that the disparate treatment defense to a finding of willful misconduct is not found in the Law, but has its genesis in the Pennsylvania Supreme Court's decision in *Woodson v. Unemployment Compensation Board of Review,* 461 Pa. 439, 336 A.2d 867 (1975). There, the Supreme Court refused to give the imprimatur of state action to the discriminatory conduct of an employer who discharged black employees for tardiness and absenteeism, but did not discharge white employees for similar tardiness and absenteeism.[7] While decisions from this Court may have expanded the

scope of the disparate treatment defense somewhat, they have not expanded the scope of the defense so far that the Board and this Court have become super-employers which must scrutinize every situation in which a claimant alleges merely that he was discharged while another employee was not. "[T]he mere fact that one employee is discharged for willful misconduct and others are not discharged for the same conduct does not establish disparate treatment." *American Racing Equipment, Inc. v. Unemployment Compensation Board of Review,* 144 Pa.Cmwlth. 310, 601 A.2d 480, 483 (1991) (citing *Bays v. Unemployment Compensation Board of Review,* 62 Pa.Cmwlth. 421, 437 A.2d 72, 73 (1981)).

■ Here, the Board does not question or challenge the existence, and Claimant's violation, of Employer's rule, which prohibited employees from using electronic devices or "computing systems for the viewing, transmission, dating, downloading, or possession of any materials that … includes pornography." (Referee Hr'g Tr. at 7; FOF ¶¶ 3–5.). Thus, there is no dispute that the Claimant was discharged for willful misconduct. The Board argues that Claimant is entitled to benefits because it found that Employer disparately applied its policy, which the Board characterizes as "an absolute prohibition against accessing pornography on [Employer's] computer system"[8] by terminating Claimant and not disciplining other employees

---

7. In doing so, the Supreme Court relied on the United States Supreme Court decision in *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). In *Moose Lodge,* the Supreme Court stated that in order for discrimination to violate the Fourteenth Amendment, "the impetus for the forbidden discrimination need not originate with the State if it is state action that enforces privately originated discrimination." *Id.* at 172, 92 S.Ct. 1965.

8. Employer's policy and code of conduct, in fact, states that "[a]ny access to pornography is strictly prohibited on Geisinger time or using Geisinger resources and *is grounds* for termination." (Employer's Electronic Communication Policy, Service Center Ex. Nos. 10–11, Record Item No. 4 (emphasis added).) We do not read such a policy as requiring that every employee who accesses pornography must be terminated.

who were found to have also accessed pornography through Employer's electronic communication systems. (Board's Br. at 7.)

In applying the disparate treatment defense to the facts of this case, we must examine whether the Claimant has made an initial showing that: (1) the employer discharged claimant, but did not discharge other employees who engaged in similar conduct; (2) the claimant was similarly situated to the other employees who were not discharged; and (3) the employer discharged the claimant based upon an improper criterion. With regard to the first point, the Board found that some of the offensive e-mails that Claimant sent had been sent to him by other employees. This is not disputed by Employer and is supported by the record, insofar as two of the six e-mails entered into evidence at the hearing were sent to Claimant by other employees.

Next, we consider whether Claimant was similarly situated to the other employees who were not discharged. When the employees are not similarly situated, then denial of benefits is appropriate. *Electric Material Co. v. Unemployment Compensation Board of Review,* 664 A.2d 1112, 1115–16 (Pa.Cmwlth.1995). In arguing that Claimant and other employees were similarly situated, the Board relies on *Remcon.* In *Remcon,* the claimant and a coworker "freely entered into" a fight. *Remcon,* 651 A.2d at 672. The claimant was fired while the other employee who took part in the fight was not. *Id.* The Court ruled that, because the conduct each employee engaged in, the fight, was identical, the claimant and his coworker were similarly situated. *Id.* at 673. Therefore, this Court held that the claimant in *Remcon* was entitled to benefits. We believe the current case is distinguishable from *Remcon* because, in determining whether

Claimant and the employees involved were similarly situated, this Court will take into consideration the severity of Claimant's conduct, as compared to the conduct of the other employees. *See Johnson v. Unemployment Compensation Board of Review,* 744 A.2d 817, 822 (Pa.Cmwlth.2000) (stating that other employees had talked about sexual subjects, but "[c]laimant's behavior was of such egregious nature that he was not similarly situated" to the other employees). In this case, Claimant failed to show that he was similarly situated to other employees who were not terminated. Two of the e-mails at issue were received by Claimant from two other Geisinger employees, each employee sending him one e-mail. However, Claimant neither testified nor presented evidence that either of the other employees forwarded as many inappropriate e-mails as he did, or that their e-mails were as inappropriate as some of the e-mails that Claimant sent. Claimant, therefore, failed to carry his burden of showing that he was similarly situated. Employer, however, presented evidence that Claimant violated the policy more frequently than other employees. The Board acknowledged, and did not discredit, Employer's witness's testimony that Claimant's conduct occurred with more regularity and was more egregious than that of the other employees. (Referee Hr'g Tr. at 12, 14–15.) The Board's Finding of Fact Paragraph 6 states that "[s]ome of the e-mails had been sent to the claimant from other employees." (FOF ¶ 6.) This necessarily supports the inference that Claimant forwarded other pornographic e-mails that were not sent to him by other employees. Indeed, Employer's witness testified as much, and the e-mails entered into evidence also demonstrate this. (Referee Hr'g Tr. at 12–13; Referee Hr'g Ex. Nos. E–1, E–4, and E–5.) Such a finding supports Employer's argument that Claimant's conduct was more pervasive and

egregious than other employees' conduct. Additionally, Claimant's e-mails to other employees included commentary that increased the vulgarity of the e-mails. For example, in E-mail 2, Claimant told a co-worker, "[s]omehow this reminded me of you." [9] (Referee Hr'g Ex. No. E–2.) The Board's determination that Claimant was similarly situated to other employees is not supported by the facts on the record or the law.[10]

For these reasons, we reverse the order of the Board.

### ORDER

**NOW,** February 5, 2009, the order of the Unemployment Compensation Board of Review in the above-captioned matter is hereby **REVERSED.**

### DISSENTING OPINION BY Judge PELLEGRINI.

Because I disagree with the majority's standard for determining whether disparate treatment exists, I respectfully dissent.

In this case, Claimant, John D. Buckeye, was discharged by his Employer, Geisinger Health Plan, for willful misconduct and he was denied unemployment compensation benefits. He filed an appeal, and a hearing was held at which his Employer's manager, Erin Winn (Winn), offered into evidence six e-mails that depicted nude or partially nude women with "jokes" attached that were the impetus for his discharge. Apparently, along with those six e-mails, there had been at least 25 other e-mails that Employer discovered that were in violation of its electronic communication policy,[1] but the six e-mails offered into evidence were the ones the manager had discussed with Claimant at the time he was fired. When Claimant testified that some of the pornographic e-mails had been sent to him by other employees, Winn admitted that other individuals who sent e-mails to Claimant had not been terminated. However, Winn testified that Claimant was terminated due to the high frequency of the e-mails that were sent during work hours to other employees and because of the severity of the pornographic images that were forwarded on.

The Referee reversed the denial of Claimant's benefits and on appeal the Board agreed because Employer had not uniformly enforced its policy. In fact, the Board concluded that Claimant had been disciplined in a disparate manner from other similarly-situated employees because

9. E-mail 2 is titled "13 REASONS NOT TO DRINK ... EVEN WITH FRIENDS" and depicts a topless woman lying face-down, and apparently passed out, surrounded by empty bottles on a picnic table. (Referee Hr'g Ex. No. E–2.)

10. Due to our holding that Claimant was not similarly situated to the employees who were not discharged, we do not reach the third element of Claimant's disparate treatment defense, that of whether Employer's discharge of Claimant was based upon an improper criterion. We note, however, that Claimant did not allege or prove that Employer discharged Claimant on account of any improper criterion.

1. Employer's policy was as follows:

Any access to pornography is strictly prohibited on Geisinger time or using Geisinger resources and is grounds for termination.

For the benefit of all of our employees, Geisinger's policy prohibiting harassment applies in its entirety to the use of the electronic communication system including downloading, possession or transmission of materials. No one may use the electronic communication system in a manner that may be construed by others as harassment or as offensive on the basis of sex, race, color, religion, national origin, ancestry, age, physical handicap, disability, marital status, veteran's status or any other non-job-related factor.

Employer's policy had been characterized as "zero-tolerance," but only Claimant had been discharged. Because Employer failed to explain why the employees who had sent the offensive e-mails were only being investigated, the Board found that Claimant had been treated differently from other similarly-situated employees and granted benefits.

On appeal, Employer argues that the Board erred in determining that it disparately applied its policy. The majority agrees stating that "Disparate treatment is an affirmative defense by which a claimant who has engaged in willful misconduct may still receive benefits *if he can make an initial showing* that: (1) the employer discharged claimant, but did not discharge other employees who engaged in similar conduct; (2) the claimant was similarly situated to the other employees who were not discharged; and (3) the employer discharged the claimant based upon an improper criterion." (Op. at 974.) (Emphasis added.) The majority then goes on to state that once the claimant has made this showing, the burden *then shifts to the employer* to show that it had a proper purpose for discharging the claimant. In developing that standard, the majority confuses who has the burden of production, i.e., which party has to come with the evidence at different points in the proceeding, with the "burden of persuasion," i.e., which party loses based on fact-finding and creditability determinations.

In this case, the majority finds that Claimant failed to satisfy the second prong based on Employer's evidence that the other employees were not similarly situated because Claimant did not show that other employees forwarded as many e-mails as Claimant did. The majority's discussion of the Employer's evidence in holding that Claimant did not meet his burden

itself shows that it was not Claimant's burden because what the other side offered is irrelevant in determining whether the party with the burden met its burden of production—only whether the burdened party has offered evidence to meet its burden. Moreover, the difference in conduct does not go to whether another employee is similarly situated—had the same status—but goes to the reasons that an employer fired one employee and not the other. I would hold that once an employee shows that other employees have engaged in the same type of conduct and are covered by the same work rule, the burden of production shifts to the employer to show that it had valid reasons to treat those employees differently.

Shifting the burden of proving that they had a "proper criterion" is necessary because the claimant would have no means by which to look at other employees' personnel files to determine if they had any other infractions, i.e., fewer or more warnings, or other conduct that would preclude them from termination. While an individual employee may be able to testify that other employees engaged in similar prohibited conduct, it is ultimately the employer who knows the reason why it terminated one employee and not the other.

In this case, both Employer and Claimant instinctively knew that this was the only practical way to make out and defend a disparate treatment claim. Claimant testified that other employees who were covered by the rules sent him similar e-mails. Employer realized that if it had not proffered any evidence whatsoever, then Claimant would have prevailed because all that would have been in evidence was Claimant's testimony that employees who engaged in the same conduct covered by the rule were not terminated. Employer countered that it had a valid reason—a proper criterion for not terminating other

employees by showing that they only sent one e-mail and not as many as Claimant. Because both sides met their burden of production, the only issue then was who met its burden of persuasion.

The Board found that Employer did not meet its burden of persuasion because it was bound by its own zero tolerance policy that one offense required termination, making the proffered reason that Claimant had sent many and the other employees only one irrelevant. An interesting question and one the majority should have addressed.

For the above reasons, I respectfully dissent.

## DISSENTING OPINION BY Judge FRIEDMAN.

Respectfully, I dissent. Although I believe that the Unemployment Compensation Board of Review's (UCBR) analysis is incomplete,[1] I believe that the UCBR's findings support the conclusion that Geisinger Health Plan (Employer) failed to establish willful misconduct in this case.

The evidence established the following facts.[2] As John D. Buckeye (Claimant) knew or should have known, Employer's electronic communications policy provides that access to pornography is strictly prohibited on Employer's time and Employer's resources and is grounds for termination. (UCBR's Findings of Fact, Nos. 3–4; R.R. at 9a.) Employer discharged Claimant after an internal audit revealed that Claimant had been forwarding pornographic e-mails to other employees through Employer's computer system. (UCBR's Findings of Fact, Nos. 5, 8.) Some of the pornographic e-mails had been sent to Claimant from other employees, but those employees were not disciplined. (UCBR's Findings of Fact, Nos. 6, 7.)

The UCBR recognized that Claimant's conduct violated Employer's electronic communications policy. However, the UCBR concluded that Claimant could not be denied benefits under section 402(e) of the Unemployment Compensation Law (Law)[3] because Employer did not uniformly enforce its policy. In reaching that conclusion, the UCBR specifically addressed the testimony of Erin Winn, Employer's human relations manager:

> The employer witness stated that it considered the amount of e-mails that the claimant sent. However, the employer's policy is that it does not tolerate *any* access to pornography on its electronic communications systems. The employer witness also stated that the investigation was continuing. However, the claimant was discharged after the e-mails were discovered on his computer. The employer does not explain why an investigation of the other employees was *allegedly* continuing as of the time of the Referee's hearing.

> The Board can only conclude that the employer did not uniformly enforce its policy.

(UCBR's decision at 2 (emphasis added)). The above reflects that the UCBR considered Winn's testimony and, exercising its

---

1. The UCBR concludes that Claimant is entitled to benefits because Employer did not discipline other employees who violated the same policy. However, the UCBR fails to explain how Employer's failure to discipline other employees relates to Claimant's eligibility for compensation.

2. Findings of fact that are not challenged are binding on appeal. *Campbell v. Unemployment Compensation Board of Review,* 694 A.2d 1167 (Pa.Cmwlth.1997).

3. Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended,* 43 P.S. § 802(e).

exclusive authority over questions of witness credibility and evidentiary weight, determined that Winn's testimony established *only* that Employer did not impose any discipline on the employees who sent pornographic e-mails to Claimant. In other words, the UCBR found that, with respect to these employees, Employer did not enforce its policy. Based on these findings, the UCBR held that Claimant is not ineligible for compensation under section 402(e) of the Law. Employer now petitions this court for review.

Unlike the majority, I agree with the UCBR that its findings do not support a determination of willful misconduct. Moreover, I believe that the court's application of a "disparate treatment" analysis to evidence of an employer's enforcement of its rules, policies and standards represents a departure from fundamental principles of unemployment compensation law.

The stated purpose of the Law is to provide economic security to persons who become unemployed through no fault of their own.[4] The Law is *not* intended to punish or provide damages for unlawful discrimination or for lawful but unfair treatment. Accordingly, it makes sense to consider evidence of an employer's inconsistent disciplinary actions only insofar as it relates to the existence of the employer's rules and standards or to the actual reasons for a claimant's discharge.

As the majority notes, *Woodson v. Unemployment Compensation Board of Review*, 461 Pa. 439, 336 A.2d 867 (1975), was the first case to consider such evidence in the context of a claim for unemployment compensation. The employer in *Woodson* discharged black employees for tardiness and absenteeism but did not discharge white employees for similar misconduct. The claimants argued that their absentee-

ism and tardiness did not constitute "willful misconduct" because it did not violate any standard of conduct that the employer had a right to expect of its employees. The claimants further asserted that they were not discharged for violating their employer's standard of conduct but, rather, because they were black. The court concluded that the record supported both contentions.

The court in *Woodson* first addressed the argument that the employer had not established a standard of conduct it rightfully expected of it employees:

A determination of whether an employee has engaged in willful misconduct can therefore only be made by considering what standard of conduct an employer reasonably requires. Standards expected by one employer may of course not be the standards of another employer. Willful misconduct cannot therefore be considered in a vacuum. It must be considered in relation to the particular employees and to the reasonable standards expected by a particular employer.

The [UCBR] found that the appellants had been excessively absent and tardy. *Such a finding would constitute "willful misconduct" if the record established that the appellants' employer discharged all employees with an absenteeism and tardiness record similar to that of the appellants. Under such circumstances, it could be said that the employer had a reasonable expectation that a certain standard of conduct would be met by its employees.* The facts in this case, however, are otherwise.

*Woodson*, 461 Pa. 439, 442–43, 336 A.2d 867, 868–69 (emphasis added). Importantly, the court observed that the employer made no claim that the white employees

4. Section 3 of the Law, 43 P.S. § 752.

were other than full-time employees or that they had legitimate reasons for their absences. Accordingly, the court further determined that the evidence of inconsistent discipline supported the claimants' second assertion, that the employer fired them only because they were black.

I recognize that the primary rationale in *Woodson* was to avoid legitimizing apparent racial discrimination; nevertheless, I suggest that a determination as to whether evidence proves unlawful discrimination is not necessary to an analysis under unemployment law. Instead, I believe that *Woodson* established two principles: 1) where the record reflects that the employer tolerates similar conduct from other employees, without justification, the employer has not proved that such conduct violates the standards of behavior it expects from its employees and benefits will not be denied pursuant to section 402(e) of the Law; and 2) if evidence establishes that the *actual* reason for a claimant's discharge is something other than willful

misconduct, benefits will not be denied under section 402(e). *See Landy & Zeller v. Unemployment Compensation Board of Review,* 110 Pa.Cmwlth. 183, 531 A.2d 1183 (1987) (holding that a determination of willful misconduct must be based on the actual reason for the claimant's discharge).

I believe that this interpretation of *Woodson* fits comfortably, and logically, within the traditional analysis of willful misconduct.[5] Unfortunately, I believe that our consideration of these evidentiary issues has deviated from traditional principles and has evolved over time to the point where, today, the majority recognizes "disparate treatment" as an "affirmative defense" to an allegation of willful misconduct.

"Disparate treatment" is a *term of art* that refers to a specific legal theory under which a party may establish a violation of laws prohibiting discrimination based on a protected trait.[6] The different reasoning

**5.** A claimant is ineligible for benefits if his unemployment is due to willful misconduct connected with his work. 43 P.S. § 802(e). The burden of proving willful misconduct rests with the employer. *Docherty v. Unemployment Compensation Board of Review,* 898 A.2d 1205 (Pa.Cmwlth.2006). Willful misconduct includes conduct evincing a wanton and willful disregard of the employer's interests, a deliberate violation of the employer's rules, the disregard of standards of behavior that an employer can rightfully expect of an employee and negligence reflecting an intentional disregard of the employer's interest or the employee's duties. *Lytle v. Unemployment Compensation Board of Review,* 36 Pa.Cmwlth. 77, 387 A.2d 962 (1978). Once the employer establishes a *prima facie* case of willful misconduct, the burden shifts to the claimant to demonstrate that under the facts of this particular case, his conduct does not constitute willful misconduct. *Electric Material Co. v. Unemployment Compensation Board of Review,* 664 A.2d 1112 (Pa.Cmwlth.1995). The claimant may satisfy his burden by proving that his actions were justified or reasonable under the circumstances. *Frazier v. Unem-*

*ployment Compensation Board of Review,* 833 A.2d 1181 (Pa.Cmwlth.2003). In addition, through evidence that the employer did not enforce its rules or policies uniformly, the claimant can establish that his conduct did not violate the standards expected by *his* employer and/or that his discharge constituted unlawful discrimination. *Woodson; Nolan v. Unemployment Compensation Board of Review,* 57 Pa.Cmwlth. 186, 425 A.2d 1203 (1981). A determination of willful misconduct is a question of law, reviewable by the court. *Frazier.*

In the present case, the majority reasons that because the UCBR does not question that Claimant violated Employer's rule, there is no dispute that Claimant was discharged for willful misconduct. Here, the majority confuses a factual determination with a conclusion of law.

**6.** The Supreme Court has described "disparate treatment" as "the most easily understood type of discrimination." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) (citations omit-

we have employed in "disparate treatment" cases and the irreconcilable holdings of those decisions demonstrate that this theory cannot be applied consistently or logically to determinations of willful misconduct.

For example, we have held that an employer's discriminatory enforcement of its standards on the basis of an employee's leadership position in a union *precludes a denial of compensation* based on willful misconduct. *Stickloon v. Unemployment Compensation Board of Review,* 82 Pa. Cmwlth. 223, 475 A.2d 893 (1984); *Birdsboro Corporation v. Unemployment Compensation Board of Review,* 59 Pa. Cmwlth. 462, 430 A.2d 361 (1981). In other cases, however, *we upheld the denial of benefits* on the grounds that differences in job responsibilities justified an employer's application of different standards in judging an employee's conduct. *American Racing Equipment, Inc. v. Unemployment Compensation Board of Review,* 144 Pa.Cmwlth. 310, 601 A.2d 480 (1991); *Moran v. Unemployment Compensation Board of Review,* 42 Pa.Cmwlth. 195, 400 A.2d 257 (1979). In some cases, we have required a preliminary inquiry into whether the employees who were treated differently were "similarly situated," and we have decided this threshold issue on the basis of various factors.[7] Alternatively, we also have reasoned that an employer may treat employees differently based on business necessity, *Daniels v. Unemployment Compensation Board of Review,* 755 A.2d 729 (Pa.Cmwlth.2000), i.e, without considering the concept of "similarly situated" in our "disparate treatment" analysis.

Moreover, relying on *Woodson,* we have held that, *unless* the employer's inconsistent treatment of its employees demonstrates that the discharge is, in reality, *unlawful discrimination,* which the denial of unemployment compensation would reinforce, the denial of benefits will not be disturbed on the ground that other employees arguably equally guilty of willful misconduct were not discharged. *Bays v. Unemployment Compensation Board of Review,* 62 Pa.Cmwlth. 421, 437 A.2d 72 (1981); *Moran.* Conversely, we have held that evidence of an employer's inconsistent enforcement of its rules precludes a denial of benefits *even if it does not* demonstrate unlawful discrimination. *Beaver Falls v. Unemployment Compensation Board of Review,* 65 Pa.Cmwlth. 14, 441 A.2d 510 (1982).

It does not appear that our decisions are consistent with each other or with unemployment compensation law. In holding that evidence of inconsistent discipline is relevant *only* to prove unlawful discrimination, we negate the relevance and probative value of such evidence to determinations of an employer's rules and expected standards of conduct. In holding that evidence of inconsistent discipline *in and of itself suffices* to preclude a denial of benefits, we ignore and undermine the purpose of the Law.

---

ted). The inquiry in "disparate treatment" cases is whether the employer is treating some people less favorably than others because of their race, religion or other protected characteristic. *Id.*

7. *See,* e.g., *Department of Transportation v. Unemployment Compensation Board of Review,* 755 A.2d 744 (Pa.Cmwlth.2000), and *American Racing,* (citing differences in employees' position in the workplace); *Electric*

*Material Company,* and *Seton, Co. v. Unemployment Compensation Board of Review,* 663 A.2d 296 (Pa.Cmwlth.1995), (citing differences in employees' work history), *appeal denied,* 546 Pa. 659, 684 A.2d 560 (1996); *Walsh v. Unemployment Compensation Board of Review,* 943 A.2d 363 (Pa.Cmwlth.2008), and *Nolan,* (citing differences in the nature of the employees' misconduct).

Indeed, I submit that we are intuitively uncomfortable with the notion that a claimant whose actions fall within the definition of willful misconduct must be awarded benefits. Thus, we reach for ways to find that employees are not "similarly situated" and distinguish employees' circumstances based on varying, subjective criteria.[8] However, as we observed in *Moran,* in unemployment compensation cases the focus is on the claimant's conduct, not the conduct of the employer, and "[j]ust as two wrongs do not make a right, an employer's wrongful conduct under one statute [concerning labor management and relations] cannot make right an employee's wrongful conduct under another." *Moran,* 400 A.2d at 259–60.

Therefore, I propose that we abandon our struggle over questions concerning ever-shifting burdens, decline to characterize "disparate treatment" as an "affirmative defense" and clarify that the Law is not intended as a legal remedy to generic unfairness. I would hold that the UCBR may consider evidence of an employer's inconsistent discipline and determine whether or not it outweighs other evidence presented to establish the standards of conduct expected by the employer and/or the actual reason for the claimant's discharge.

These examples illustrate how a more straightforward analysis may be applied.

1. A claimant frequently takes pens and pencils home from the office. The employer fires the claimant and alleges that the violation of its rule prohibiting the theft of office supplies constitutes willful misconduct. The employer acknowledges that other employees took pens and pencils home and that employer was aware of their conduct but did not discipline these workers in any way for violating its policy. The UCBR is not persuaded that the witnesses' testimony adequately explains why the other employees were not disciplined. Based on these findings, the UCBR concludes that the employer failed to establish a violation of its expected standard of behavior, and, therefore, the claimant cannot be denied benefits on the grounds of willful misconduct.

2. A claimant steals money from the employer's cash drawer. The employer fires the claimant and alleges that stealing from an employer constitutes willful misconduct. The employer acknowledges, and the UCBR finds, that another employee also stole funds from the employer's cash drawer and that the employer was aware of this but did not discipline that employee. The employer's witness testifies that the other employee is his wife's nephew and argues that its failure to discipline the coworker has no bearing on its decision to terminate the claimant. The UCBR finds that the employer's failure to discipline the claimant's coworker did not outweigh other evidence that the claimant's theft violated the standards of behavior expected by this employer. Based on these findings, the UCBR concludes that the claimant was discharged for willful misconduct and is ineligible for benefits.

So long as the UCBR's findings are supported by substantial evidence, the court could determine that those findings support the UCBR's ultimate conclusion in both cases, without inquiring whether "dis-

---

8. In addressing claims of inconsistent discipline, we frequently inquire "whether similarly situated people are treated differently, based on *improper* criteria." *Department of Transportation,* 755 A.2d at 748 (emphasis added). The courts' inability or unwillingness to establish an objective standard for evaluating whether criteria are "improper" leads to different and unpredictable results.

parate treatment" was established or whether employees were "similarly situated" and notwithstanding the fact that the employer's disciplinary measures were not uniformly imposed.

In the present case, instead of inquiring whether Claimant established "disparate treatment," I would inquire whether the UCBR determined that evidence of Employer's failure to discipline other employees outweighed other evidence offered to establish the standard of conduct that Employer expected of its employees. In my view, the UCBR was not persuaded by Witts' explanation as to why Employer did not pursue *any* disciplinary action against Claimant's coworkers, who admittedly violated the same policy. Instead, I believe the UCBR was unable to find that Employer's written policy represented the standards of behavior that *this* employer expected of its employees.

Like the majority, I do not read Employer's policy as requiring that every employee who accesses pornography must be terminated. However, like the UCBR, I would interpret the phrase "is strictly pro-hibited" as requiring *some* disciplinary response to a violation, and I would conclude that the failure to impose *any* discipline for a violation of the policy renders the phrase "is strictly prohibited" less than credible as a statement of Employer's expected standards of behavior. Thus, I believe that the UCBR's decision reflects its determination that Employer's failure to impose *any* discipline upon the other employees who violated its rule rebutted Employer's assertion that such conduct "is *strictly prohibited.*" The UCBR's findings support the legal conclusion that Employer failed to meet its burden of proof in this case.

Accordingly, I would affirm.

Judge SMITH–RIBNER joins in this dissent.